The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right. Thank you. You can be seated. All right, Mr. Beverly, whenever you're ready. Good morning, Your Honors. Good morning. May it please the Court, my name is Michael Beverly. I represent Officer Ray in this appeal. In this matter, the District Court erred in finding that Officer Ray was not entitled to qualified immunity, because Officer Ray's conduct on the night in question was not clearly established as unlawful. For conduct to be clearly established as unlawful, existing precedent must make the constitutional question beyond debate. And this can be looked at from closely analogous cases, which will show that the manner in which the clearly established right applies is apparent. Qualified immunity protects all but plainly incompetent conduct or knowing violations of the law. And as I indicated, courts will typically look to see whether or not there is a closely analogous situation that makes the application of law to fact apparent and clear to reasonable officials. In this particular case, we'd like to focus you in on two cases that the District Court focused in on, and we focused in on our briefs in this matter. The first case is the Dunn v. Van Meter case. And yes, this is a District Court case out of the Western District of Virginia. However, we feel that this, even though it does not present any precedential value, that it's persuasive. It's persuasive because it presents virtually identical facts, aside from the fact that in that case it was a male, in this case it was a female. But it's rare in these types of excessive force situations, especially nonviolent, I'm sorry, not nonviolent, but situations that do not involve police shootings. It's very rare that you find cases that have the type of similarities, the identicalness of these two cases. Where in the continuum of conduct would you say that your cases apply? Where in the continuum of conduct? Ms. Smith is out on the porch, the officer has taken her by the arm, and I believe the first opinion from this Court said that that was an appropriate use of force. So, after that, what do you say happened, and why is that non-disputed factually, and how does the clearly established law apply to that? Okay, thank you, Your Honor. At the moment that we're on the porch, it's interesting that you bring that up. At the moment that we're on the porch, we have to look at these cases from the moment that force was employed. And at the moment that force was employed is basically at the moment that Your Honor just began. And at that moment where Officer Ray began to grab Ms. Smith's arm, that's where this case is practically identical to the Dunn v. VanMeter case that I pointed out, because at that moment, at the moment that force was employed, there was probable cause to make an arrest in both cases. Yes, in the Dunn case, it was with an arrest warrant. Here, there was probable cause to make an arrest for contributing to the delinquency of a minor and for obstruction of justice at that moment wherein he grabbed her arm. What about after that? After that, the two cases, as I indicated, are virtually similar factually from the standpoint of the arm grab, the perception of her trying to flee, the takedown to the ground, the administration of the blows to the side in order to gain compliance, as well as the knee placed into the back, and even down to the nature of the injury that was suffered by both. And in the Western District case, the Dunn case, the Western District found that the officers were entitled to qualified immunity based on facts that happened one year after the conduct that happened in this case. In Mr. Dunn's case, didn't the officer tell the defendant that he had an arrest warrant for him? Yes, sir. The officer did tell him he had an arrest warrant. And in our case that we have here, she denies she was ever told why she was being grabbed or held. Well, she may deny that she was ever told why she was being—what we have to focus in on, the Supreme Court tells us, and this Court tells us, that we have to focus in on the officer's perceptions at the moment that force was employed, focusing in on—through the lens of the officer's perceptions at that moment. And now— But you still have to accept the facts in the light most favorable to her, which is, or which are, that he did not tell her she was being detained or arrested. Well, he may not have told her that she was being detained or being arrested. That does not change the fact at that very moment that he had probable cause to make an arrest for obstruction of justice. So that's not a factor, whether or not an officer tells a person they're detaining that they are under arrest or they are being detained, that's not a factor to consider. It's a factor that the Court can consider. But what we would submit is that it's not a factor. It's not a factor that we carry. The weight, necessarily, is determinative in the outcome in this particular instance, especially wherein you have situations that are, as I indicated, virtually identical, virtually identical from that moment forward, the moment that force was first employed, i.e., the arm grab, from that moment forward, wherein there is probable cause to make an arrest for an offense that involved the health, safety, and welfare of citizens. In this case, obstruction of justice and contributing to the delinquency of a minor. What was the obstruction of justice? The obstruction of justice is that in the state of Virginia, under the common law of Virginia— I know what the law is. I'm talking about the facts of this case that would make one think that she was engaged in obstruction of justice when he touched her. The fact that under these circumstances, if I could just back up just a little bit, it's undisputed that Amanda Smith makes the— undisputed in the record that no one except Officer Ray can admit or deny Officer Ray's perceptions of what was going on. And Officer Ray's perceptions of what was going on include the fact that he was in an area known for drugs, gang activity, and criminal activity. He had just recently seen what he believed to be the missing stepson through the window. At that point in time, he goes up to the door and knocks on the door. I know the facts there. Show me what part is obstruction of justice. Well, the obstruction of justice— The fact that she's there? The obstruction of justice is that with all of these things in his background and the fact that when he reaches out to her, part of what— Well, he didn't reach out to her. The first thing he did was he closed the door. When he closed the door— What was the purpose of closing the door? The purpose of closing the door is he's trying to institute an investigative detention at that point. She's not free to restrict during an investigative detention. So she was under arrest from that point when he closed the door? It was an investigative detention. Oh, that was detention? Investigative detention. During an investigative detention, she cannot resist that investigative detention, and when she jumps back off and nearly falls off the porch in her reaction to Officer Ray, that excites a belief in Officer Ray based on all of these other things, as I indicated, are going on, the fact that there's a missing juvenile he believes he's seen in the house, the fact that this is an area known for violence, known for gang activity, known for crime, all of those things excited in back of Officer Ray's mind would raise his level of apprehension at that very moment such that when she makes that move— So he knew she would have been drinking? He believed his perceptions were that she had been under the influence of an intoxicant, and I'm glad that you brought that up because I think that's an important factor in this case because she admits that she cannot deny the mental impressions of Officer Ray, and she cannot point to any facts in the record that Officer Ray's perceptions were unreasonable for any reason. Well, didn't she say she hadn't been drinking? The fact that she says that she had not been drinking does not change the perceptions of a reasonable officer on the scene. Well, on what basis would he think she's been drinking if she hadn't been drinking? As is indicated in the record, it was based on how her dilated pupils, this gaze and stare straight through him, the unresponsiveness responsive to him, the testimony of Officer Ray is consistent with the juvenile delinquent stepson. So he's saying she's intoxicated but not necessarily from alcohol. He's under the influence of some sort of substance, some sort of intoxicant, and that's what's in the record. And the reason why it's important that these are his perceptions and they should be taken as facts, even in taking the facts in favor of Ms. Smith, she admits that no one can do anything but admit or deny Officer Ray's mental impressions. So is your position that if he has a right to detain her for investigation, that without saying anything to her, he can pick her up, throw her down on the ground, put his knee in her back, twist her arm behind her back, and break her rib? No, sir. No, sir. That is not – that is – Well, I don't understand what other facts there are that would give him the right to do that. Well, at the moment that she pulls her arm away, it's not clearly established that he can't grab her arm. It's not clearly established that it's unlawful for him to grab her arm. We have to focus on the moment that that force was employed. We've got to take into account all of these factors. He's picked her up, he's thrown her on the ground, he's beaten her up, then he yanks her up by her hair. What's clearly established about that? That is our point. There is nothing clearly established about as unlawful with regards to the hair pulling. We've cited numerous cases in our brief, and, in fact, in various different constitutional situations, the court has described it as de minimis under the Eighth Amendment constitutional standard. That it's de minimis if a trier of fact believed Ms. Smith, that the officer threw me on the ground, did everything Judge Trexler just cited to you, and then pulled me up off the ground by my hair, that's a de minimis application of force. Yes, under the – there is no clearly established law with regards specific to hair pulling that clearly establishes that that is unlawful. We've cited numerous cases in our briefs from various different circuits, and the United States Supreme Court has stated that where there's circuit differences on a particular constitutional issue, it cannot be considered to be beyond debate. In various different circumstances, the allegations were that in a jail setting, the allegations were that – of similar types of allegations of punching and beating and so forth, and then pulling up by the hair towards the end of the confrontations in the cases that we've cited. And the courts have said that the hair pulling itself is not unconstitutional. And the fact that there is conflicting circuit court opinion on the hair – specific to the hair pulling issue, it cannot be considered to be clearly established. If I could, I would like to go back to Judge Traxler's question with regards to why wasn't it – it wasn't clearly established with regards to the lawfulness of the punching, the slamming, and so forth. Do you agree a successive amount of force used was excessive? No, we do not agree. You don't think that's already established by Judge Gregory's opinion? No, the fact that – no, there are additional facts that were introduced in the record after Judge Gregory's opinion came down. Number one, the fact that this case has to be evaluated from the perceptions – from the focus on perceptions. That doesn't qualify immunity, will it? That may be more of a qualified immunity question than a question of excessiveness. That's what we are hearing. That's why – that is why Officer Ray believes that he is entitled to qualified immunity. It is – this is a qualified immunity case. And we believe that there are additional facts that have been introduced into the record subsequent to Officer – I'm sorry, Judge Gregory's opinion the first time. Number one, that she admits that she cannot deny Officer Ray's impressions, perceptions of what was going on. She – nowhere in the record does she point to his perceptions being unreasonable at any point in time. And so, Officer Ray – Don't write new facts that change the finding of excessiveness. You're just merely arguing in terms of an application of law there. But what's the new fact that would justify the excessive force? None. The new facts are that if we look at this case in accordance with the Waterman case, where we have to focus on the moment that the force was employed. At the moment that the force was employed – at the force was employed – That's right. We've got to look at the – from the initial encounter. We did. At the moment – Counsel, counsel, trust me, we did. We looked at all those facts. What new fact exists that would inform our decision about excessiveness? The new facts that exist really are Officer Ray's – the fact that Amanda Smith has admitted at summary judgment that she cannot deny Officer Ray's perceptions. And the new facts that – and it was not clear from the formal opinion that Officer Ray's perceptions of the area, Officer Ray's perceptions of her appearing to be intoxicated, Officer Ray's perceptions of her believing that she had a weapon, Officer Ray's perceptions of her fleeing and attempting to flee. Those are all new facts. New facts. She believed she had a weapon? That she perhaps had had a weapon in part based on the fact that he was in an area known for crime, and that is in the record. The weapon didn't come up until she admitted that she had one, and after he had punched her in the ribs and broken her ribs. That was in the first case. That was not – that was in the first case where we were taking facts – Did it change, counsel? Did it morph into something else? It didn't morph. What we had on remand is we had the opportunity to go through discovery, and then during the discovery process – You found what? We found out that Officer Ray, at all points in time, believed that she may have been in possession of a weapon. Because she was in a dangerous neighborhood? Because she was in a bad neighborhood, because she attempted to pull her arm back, because in the manner in which she was resisting when Officer Ray was simply here to look for her. Did Officer Ray ever tell her that he was there trying to investigate a missing juvenile? Yes, he did. When? He told her from the very beginning, and that was part of the reason for the investigation. That's what he said was, is he here? Yes, he told her – he asked if the individual was there. Right. And he didn't say anything about investigation, did he? He just closed the door and grabbed her by the arm. He did not just close the door and grab her by the arm. He asked her if the missing juvenile was in the home. And she was trying to be helpful. She said – he asked about another person. She said, well, let me go. I'll go over and look.  She was in the process of cooperating with him. Is that the fact? No, she was not in the process of cooperating with him. Okay. She appeared to be under the influence of an intoxicant at that moment. That's an undisputed fact, that her appearance is an undisputed fact. Whether or not she was actually under the influence of an intoxicant, that is something else. But her appearance, we have to go by what the officer believed what he was facing at that moment in time. The best way I can put it to you, Your Honor, is that – and often in the shooting cases, the court focuses on was it fairly – was it fair for the officer to believe that the individual possessed a weapon, even though the individual may have just been reaching into his pocket for his ID and it appeared to be shiny and it appeared to be in the shape of a weapon. And so the court says if it was reasonable for that officer to believe that that was a weapon, the fact that it was not a weapon does not change the fact. Here, the fact that she was not intoxicated – It's amazing that you would try to bring and analogize those cases with this case here. There was no attempt to reach for anything, no further – she was going into the house. Upon responding to that, let me go see. And then there's no evidence that she quickly reached for something. That has not even been the case at all. And I'm not trying to analogize it from that perspective. I'm just trying to analogize it from this perspective of the reasonableness of his perception of her being under the influence of an intoxicant. And that is a different fact in this case that we believe influences the nature of this case. Okay. You've got some time reserved. Let's hear from Mr. Hart. Thank you, Your Honor. You'll be back for reply. May it please the Court, Darren Marshall Hart for Amanda Smith. We would ask that the Court affirm the judgment of the trial court, the district court, and deny the motion for summary judgment based on qualified immunity offered by Officer Ray. No one is safe if the police officers commit crimes against the citizens they have sworn to protect. This is a de novo review by the Court. It's a motion for summary judgment. Can you speak up just a little bit? Yes, sir. I apologize. It's a de novo review by the Court. It's a motion for summary judgment. All will have pled facts. All facts are drawn in favor of the non-moving party. That would be Amanda Smith. The measure that Officer Ray must come to is, I quote from the case of Owens versus the Baltimore City State Attorney's Office. It says, quote, to establish a qualified immunity defense, a public official must demonstrate that, one, plaintiffs was not alleged or shown a fact that make out a violation of a constitutional right or that, two, the right at issue was not clearly established at the time of the alleged violation. Officer Ray bears the burden of proof, the burden of persuasion, and the burden of production going forward in this matter. He's filled to carry that burden. In this matter, in the trial court, on summary judgment, it fails to carry the burden before this court as well. When looking at this matter, you have to examine what is, if you're going to establish, and either one or two can be dealt with by the court according to whether the, whatever process or whatever order the court chooses itself. If you were to examine that, though, it's, clearly she has a Fourth Amendment right to be free from, has a Fourth Amendment right to be free from illegal search and seizure. That includes her body. The facts are fairly clear as processed by this court, and we believe it's actually the law of the case. It was excessive force because this court has said so, and that is the law of the case and was the previous opinion by this court. Amanda Smith talked with Officer Ray on the stoop. She shut the door behind her. She answered his questions. Officer Ray knew that Amanda Smith was an overnight guest at the house, so, therefore, that house is her defective home, and if she's in the curtilage of that home, the same rules apply to her as if she owned the house. Officer Ray knew her name, knew how old she was, knew why she was there, and that she was waiting for a ride to get home. Officer Ray asked about the location. Is TV here? That would be the minor. She said no. He asked if Joel was there, and she said, sure, I'll get him. As she went to return to go back into the house, he shut the door, and then he grabbed her arm. Amanda Smith says without rebuttal that, or she says, and that's her evidence, is that I never was told I was under an investigative detention. I was never told that I was under arrest. And then Officer Ray proceeded to assault and batter and beat Amanda Smith, dropping her to the ground with the help of Tony Bullard. This is not about Officer Ray's perceptions, instead about what the reasonable officer, the objective standard of reasonable officer, given those circumstances. Amanda Smith was helping him. According to her, she was not intoxicated, and she was not doing anything. According to Amanda Smith, she was simply trying to walk away from the police officer. This circumstance where he grabbed her, you have to view that in totality, the circumstances, about the excessive force or about the qualified immunity. And there's a variety of cases, but what do you examine? You have to examine cases that deal with issues that arose on or before September 21, 2006. That's the date that Officer Ray beat Amanda Smith and fractured her rib. So it can be cases that were decided after that time, but it has to be an event that occurred at that date or prior. The Owen versus the Baltimore City Attorney's Office, that does happen. It was a 1988 event, although it was decided recently by the court. I do know that there is a dissent on that as well as a concurrence, and I understand that. But if you examine, there's a lot of case law. What kind of case law do you examine? The case law that you examine are Supreme Court decisions, decisions of this circuit court, and likewise the courts, the authority from the highest court, which would be the Supreme Court of Virginia. That is Lefamine, which is a case from this court, which says that. The Supreme Court has said in Reichel that you also look at other sister circuits to decide what the law is for them as well. The law is very clear, and it was developed on September 21, 2006, that Officer Ray knew he should not have grabbed Amanda Smith. If he was arresting her, he should have arrested her. He didn't arrest her. He simply grabbed her because he was angry with her, because she's allowed to walk away. And Officer Ray's perceptions is exactly that, and that's in the record now. That's something we didn't have in the first time is he said, I knew she was not a stakeholder in the home. That means he knew that she didn't own the home. She couldn't control who came before the house or was allowed to stay in the house. That's two Supreme Court of the United States decisions, Minnesota v. Carter and Minnesota v. Owen, and I believe that's correct. It's contained in my brief, and just for the record, I would like to ask that any points I miss in oral argument are contained there in my brief. So she has no control over that, and Officer Ray knew that. Officer Ray, as the court picked up in this oral argument, never asked, never said, there's nothing in the record to show that Officer Ray was looking for TV. According to Amanda Smith, he never told that to her. So she has no idea. As far as she knows, the police have arrived on the doorstep and are looking for two individuals. One is present, one is not. If Officer Ray really was looking for TV, and that's very questionable, because it's not just what Officer Ray knew, it's what he could have reasonably found out, and the record is more developed at this point. For example, when Officer Ray went to the first location, Adler Avenue, the woman who answered the door was angry with him, told him to go away, and she did not want to talk with him. But he had the same indicia, allegedly, Mr. Bullard, saw what he said was his son, but in fact, if Officer Ray had done even a modicum of investigation, he would have learned that Tony Bullard was not the father, not the stepfather, and in fact was no longer married or in a relationship with TV's mother. How would he know that from just looking at that? Well, Ms. Rose was there. She's the girlfriend of Tony Bullard. Well, did Officer Ray, does the record reflect that Officer Ray asked Mr. Bullard, who's the woman there with you? No. Nothing. No investigation. I had a very harsh comment to say, I believe, in my brief in one of the footnotes about that. With no investigation, what do you know what Tony Bullard's status is to TV? Nothing. And Officer Ray doesn't know, and that's shown because he deviates. His father, stepfather, now I don't know. So there's no idea why Officer Ray went over there, except that the lady at Adler Avenue said, well, maybe he's over at this other house. And, again, Officer Ray believes, and the court has found, that he saw what he believed was TV in the house. But that doesn't affect the – he was not there for Amanda Smith. Amanda Smith was not there to be arrested. He didn't have a warrant for Amanda Smith. And that goes back to another case, which was put as additional authority here, which is the Sims case, which came from the Supreme Court of the United States. It reflects back, though, to Welch v. Wisconsin. It's a very rare circumstance that you can make an arrest without a warrant and the curtilage of a home. That's exactly where Amanda Smith is. And in the Fourth Amendment search and seizure law, it does matter where you are. Cars are afforded less privacy than a home. The home is afforded the most privacy. Officer Ray doesn't have any circumstances that he can point to or anything that he can say that points to the fact that he should be allowed to make a warrantless arrest of Amanda Smith and the curtilage of the home, regardless of probable cause. If he had probable cause, it is his responsibility to take the neutral magistrate and go right there and get a warrant for her arrest. He had her name. He could locate her. Haven't we already decided that there were sufficient facts to warrant a detention for investigation? You did, actually. Chief Judge Traxler, you did. If I may point the court to a case from one of our sister circuits that addresses this issue of whether she pulled her arm away, I believe quite well. But the case that settles this matter, I believe, from our circuit is Rolland v. Perry. It's 41 F. 3rd, 167. It's from this court. The other case we direct the court's attention to is Dixon v. Richer, R-I-C-H-E-R. It's 922 F. 2nd, 1456. It's from the Tenth Circuit. It says, quote, As for resisting arrest, it bears reminding that Dixons were not under arrest. They were ostensibly stopped in order to ask them some questions. That Willie Dixon resisted being choked and beaten does not rectoactively justify it. Neither does high-end Dixon's resistance rectoactively justify the less treatment of her or her husband. And in this case, the Dixons were stopped for questioning about a misdemeanor arrest. Mr. Dixon had carried a weapon because he was an officer or some legal law enforcement officer of some sort. They were very angry that people were arresting him. They kicked him. He fell down. Then they started to beat and choke him. His wife flew in and went to try to come to his aid. The officers pushed her to the ground and injured her as well. And they're saying, and this is very similar circumstance that we have here, is that, hey, you started that because you didn't have a right to grab her in the first place. And that's my point. There's not a right to grab Amanda Smith in the first place. I mean, not without saying you're under arrest, not without saying you're under investigative detention. Is there a requirement in Virginia law that an officer taking a person into custody for either arrest purposes or investigative detention has to advise them that they are being taken into custody? Sure. The police have no, I don't, I can't point to a case. I mean, it's statutory usually. No, I'm not. That's your case law. No, sir, I don't have that with me today. But the point is, is how would Amanda Smith or any other citizen know? This is a circumstance that affects us all. If you respond to a police officer on your front stoop and decide to disengage and walk away, you're not allowed to be grabbed and thrown to the ground and beaten. And that's exactly what Officer Ray did to Amanda Smith. Now, how are you supposed to comply with the police officer if they don't go, hey, police, stop, which is one of the cases, or, hey, you're under arrest, or, hey, I need to talk with you. Don't leave. Without an assertion of authority, you're free to walk away. You're free not to answer the door, too, which would have probably been the better option. But she did answer the door. And the second, Officer Ray says something in the testimony, which we put in our brief, which is very pointed. I don't know the point at which Amanda Smith was free to walk away once she stepped out the door. That means she was under arrest the second she stepped out the door. She was seized for Fourth Amendment purposes the second she stepped out that door. But why? No warrant. Well, this court says there's probable cause, but even if there's probable cause, why don't you go get a warrant? It's the same thing that it has with the partially open switchblade. It's the same thing where he doesn't know what he's charging her with. He said he charged her with a partially open switchblade. That's an impossibility. The switchblade, by definition, springs open. It doesn't open halfway. And the court below identified that as well. I mean, how do you charge her for adult harboring a juvenile? That's not even a crime. That's what he put in his excessive force report. It's not even a crime. And certainly that's the objective standard. You have to look at all the facts that are available to him to determine probable cause. But even if probable cause, because of a cartilage, you can have a warrant. It's very rare that you don't. As far as the excessive force is concerned, it's Rowland v. Peary. According to the individual, he's just picking up a $5 bill. Police officer picked him up by his collar, slammed him to the ground. They're wrestling. He's trying to get away. The officer puts a wrestling maneuver on and cracks his knee. That's when he hears a crack, and then he goes limp. There's other cases that are throughout the United States, and I'm happy to go through them if I may. And we have in our brief, but very significant. It's not a function of just being in handcuffs. There's a case from this circuit, 2009. The case is Valderas v. Cordero. He even pushed the police officer. The police officer slammed him into the car. That was excessive force. No qualified immunity. The case from the First Circuit, it's 67 F. 3rd, 341. It's a Lexus v. McDonald's restaurant. We cited it in our brief. She is asked to leave. Certainly she's not there on the property appropriately. Police officers are asking to leave. Pull her up from the booth, bruise her legs. They're denied qualified immunity. There is a case, Palmer v. Sanderson. It's the Ninth Circuit. They bruised an individual who was under investigative detention, went back to his car as an elderly gentleman. They bruised him when they were trying to take him in. Who attempted to return to his car while answering officers' questions. This also cited Rowland v. Perry. There's a replete. We have it in our brief. In this case also, in the case of Lexus v. McDonald's puts down a lot of cases as well. This is clear. There's no doubt. The right is clear. It's established. There are clear guideposts to govern Officer Ray. He chose not to do that. About the hair pulling. That's not the same measure, if I would. The case that was cited in the brief by Officer Ray is Gavin v. Ammons. It is from the Seventh Circuit, 21F, 3rd, 430. This is an Eighth Amendment case. The standard that they use there is, quote, even though there is no evidence in this case that Guy needed to pull Gavin's hair to maintain or restore discipline, during the transfer, the use of force was de minimis and not of a sort that would be considered repugnant to mankind. That's an Eighth Amendment consideration. That's for control in prisons for health, safety, welfare of guards and other inmates. That's not the same standard on the street. It's not the same standard under the Fourth Amendment. The case is in a posit. Simply stated. Don't you think you have an Eighth Amendment claim? As a pretrial detainee, I think that it actually travels under the Fourth Amendment, not the Eighth Amendment, Your Honor. You don't think that after he's beaten her, broken her ribs, she's cuffed and then she's in custody, then they drag her by her hair? That doesn't come to an Eighth Amendment question? I believe that what I understand. I think it's more of a Fourth Amendment claim because I think the Eighth Amendment applies to prisoners because she would be a pretrial detainee. She's not actually a prisoner at that point. You might want to look at a case in the Fourth Circuit where a woman was tased in the back of a car. I understand which case you're talking about. I came from the Western District where they were trying to say she suffered de minimis, and then, in fact, she actually suffered real injury and the case was allowed to go forward. So, yes, I believe that you are correct. I apologize. The bottom line is that Amanda Smith was doing nothing wrong. She was exercising her constitutional right to answer the questions or not, and then she's exercising her constitutional right to walk away. She pulled her arm away because Officer Ray inappropriately initiated contact with her, and then when she did, he didn't still. This, I guess, is the most important part. Once she pulled her arm away, Officer Ray still doesn't say, hey, I need you to stay here. You're under investigative detention. You're under arrest. Yet, according to Officer Ray's perceptions, he said she was under arrest when she left the front door. Let's suppose she took a step away. He says stop and grabs her arm, and then she starts fighting him and all this happens. Would you still have a claim? I believe so. I think it is to stop you under investigative arrest or I need you to stay here and ask you for questions. Why is the police saying stop? There's no unsettled situation they need to control. We've already said there's enough evidence to take her into investigative detention. Sure. So he says stop, and he grabs her by the arm, and then she fights him and resists, and he responds with force. Would you have a claim? And if so, on what basis? I believe so. I believe so. It's not as good a claim. Certainly not. It's not as good a claim, but it certainly is a claim. For the jury to decide whether that was an appropriate command from the police officer, likely we'll lose that on summary judgment. Assume it's true. Assume, for purposes of the hypothetical, he says stop. Puts his hand on her, and then she fights him. Once the court has made the decision that it is, that there's probable cause for an investigative detention, then that's done. She doesn't have a case. Once that determination is made that there's probable cause, and he says stop, then she's disobeying a proper order of the police officer. But she didn't disobey a proper order of the police officer. Did you understand the question? I believe I did. Are you conceding that, as in this case, you have probable cause to detain? May I finish my question? He has probable cause to detain, and says stop. And if she pulls away, as Judge Trax was asking you, then that would give him, as a matter of law, to go on further. After she's subdued, kneeing her back on the ground, she says she couldn't breathe, she was only lifting up to breathe. He could punch her in the ribs three times and break a rib, and all of that wouldn't matter after that. Just because he said stop. Are you conceding that? It's your case, but I'm just asking, did you understand the question? Clearly I did not. Apparently you didn't. The answer is no. I don't concede that, Your Honor. No, I did not. The way I counted was she continues to fight him and resist, and that's the difference, I think. No, it goes back to the Graham v. Conner measurement, which is, did she commit a crime? No. Was the crime alleged that she committed was severe? No. Was she actually convicted of a crime? The answer, did she try to resist? The answer is no again. So, no. That's excessive force, and that's what the court found. And so, no, I did not understand the question. We thank the court for clarifying it for us. So, no, it's excessive force, and no. Officer Ray should not be entitled to qualified immunity under these circumstances, and the law is clear, both as to her right and the previous precedent. Happening prior to September 21, 2006. Does the court have any further questions? No, I think we understand your position. We thank the court for its time this morning. Thank you. Let's hear a reply from Mr. Beverly. Thank you, Your Honors. Earlier, you asked about additional facts, and I tried to impress upon Your Honors that the additional facts include, in this case, the fact that Amanda Smith has since, on remand, indicated that no one except Officer Ray, and these are her words, no one except Officer Ray may admit or deny the mental impressions of Officer Ray. Neither Smith nor anyone else may do anything but admit what Officer Ray heard or his time recollection for both observations or his perceptions and or mental impressions. Officer Ray, as part in the record in this case, testifies that in deposition, and this is in the record, that he in fact did inform her that she was under investigative detention. So that's a big factual dispute now, isn't it? It's not a factual dispute, and here's why it's not a factual dispute, Your Honor. She has to point to a fact that makes Officer Ray's perceptions of what he did unreasonable. She has to point to something other than just her denying. The fact that she didn't hear it, the fact that she didn't hear it does not mean that it wasn't said, and she's admitted that she cannot deny that what Officer Ray may have perceived about him saying about this incident. She's admitted that she cannot deny any of his perceptions, and she has made no argument in the record, and there are no facts in the record, that Officer Ray's perceptions of what was going on at the moment that force was employed were unreasonable. And the best way I can illustrate this to you, Your Honor, is that if I was talking here to the clerk, and I believe that the clerk is listening to our entire argument, I'm sorry, if I was talking to Your Honor here this morning, and I believe that the clerk is listening, that doesn't mean that if the clerk is later questioned this afternoon that she heard everything that I said, and she could very well say, no, I didn't hear Mr. Beverly say X, Y, and Z. That doesn't change the fact that it's reasonable for everyone here in this courtroom to perceive that I said it. It's reasonable for me to say that I said it. That's the difference. That's the difference in this case. If the opposing party says you didn't say it, then we're going to use what the non-moving party says is true. She says nobody ever told her why he was grabbing her. Nobody ever told her why he shoved her and put his knee in his back. Graham v. Conner tells us to focus on the moment that the force was employed through the lens of the officer's perceptions. That doesn't mean take everything the officer says happened as true. No, it does not mean take as true. But what you find in cases is that there are certain instances where it is unreasonable to believe the officer's perceptions. The officer wasn't even looking in that direction. If she says I told her and she says you didn't, how do you propose we look at the denial by the victim that he never told her anything? Well, Your Honor, we have to, as I indicated, Graham tells us, if anything, this discussion illustrates Ray's argument, which is that it's not clearly established as unlawful, his conduct in this case. His conduct in this case is not clearly established as unlawful at the moment. As I indicated, if we look at that Dunn case, it's virtually identical. And the Supreme Court in Stanton v. Sims in November 2013 said where district courts have ruled in the face of existing circuit court precedent on a broadly defined constitutional issue, where district courts have ruled contrary to that, in the face of that, then the law regarding that particular constitutional issue cannot be considered beyond debate. And here, that's what we have. We have the chief judge of the Western District of Virginia issuing opinion on facts that are virtually identical to the facts we have here at issue. And when you have that in the face of, yes, the Roland v. Perry case, but the Roland case was a much more casual encounter than what we had here. Much more casual. It wasn't colored by any of the things of the background as far as the area, any of the perceptions of the officer, none of that. The perceived resistance, the district court even noted that it's fairly perceived as resistance, her pushing away from him. I'm not sure Roland was more casual. Roland, there was an arrest warrant in the possession of the officer, wasn't there? And didn't he tell the person he was detaining that? No, that's the Dunn case you're referring to. The Roland v. Perry case is the $5 bill case. That was a much more casual. That was just essentially walking down Broad Street seeing a $5 bill. That's a much more casual encounter than what we have here as illustrated by Mr. Hart's recitation of the facts wherein the officer's already been in pursuit of the juvenile. And then comes to the home knowing the area is known for what it's known for. There's a much higher level of trepidation. Where we have a district court opinion in the face of circuit court precedent on a broadly defined issue, the Supreme Court tells us in Stanton v. Sims that the constitutional question cannot be beyond debate. Because where judges disagree, where judges disagree, and we have a Western District of Virginia judge disagree, then the case cannot be considered beyond debate. Thank you, Your Honor. Thank you. Mr. Beverly, we'll come down and recounsel and then go into our next case.
judges: William B. Traxler, Jr., Roger L. Gregory, G. Steven Agee